UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
UNITED STATES OF AMERICA )
)
v. ) Criminal No. 18-0117 (PLF)
)
DERRICK WILLS, )
)
Defendant. )
_____)


OPINION AND ORDER

This matter comes before the Court on defendant Derrick Wills' motion [Dkt. No. 12] to suppress statements and motion [Dkt. No. 13] to suppress tangible evidence, both filed on June 5, 2018. The government filed an omnibus opposition [Dkt. No. 17] to the motions to suppress on June 18, 2018. On July 11, 2018, the Court held a hearing on the motions. The government presented two witnesses – Officer Krishaon Ewing and Officer Dmitry Gendelman. And both parties submitted evidence, including a number of video recordings from officers' body-worn cameras, and made further arguments in support of their positions. Upon consideration of the testimony and evidence presented at the hearing, the written and oral arguments of the parties, and the entire record in this case, the Court will grant both motions to suppress.[1]

---

[1]     In connection with the pending motions, the Court has reviewed the following filings, including the exhibits attached thereto: Defendant's Motion to Suppress Statements [Dkt. No. 12]; Defendant's Motion to Suppress Tangible Evidence [Dkt. No. 13]; Government's Opposition to Defendant's Motions to Suppress ("Opp'n") [Dkt. No. 17]; Government's Supplemental Opposition to Defendant's Motions to Suppress [Dkt. No. 22]; and Supplemental Authorities in Support of Defendant's Motion to Suppress Tangible Evidence [Dkt. No. 24].

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of February 3, 2018, Metropolitan Police Department ("MPD") officers were patrolling the 2300 block of Good Hope Court in Southeast Washington, D.C. During this routine patrol, Officers Krishaon Ewing, Herman Kelly, and David Whitehead were riding as passengers in a marked police car driven by Officer Lavon Woods. According to Officer Ewing's testimony, the officers spotted three men, two of whom the officers suspected were drinking open containers of alcohol because the men were drinking from red "Solo-style" cups. Mr. Wills was the third man, not drinking from a red cup.

Officer Ewing testified that, upon seeing the police car drive closer to the group, Mr. Wills turned and started to walk away, toward the exit of the apartment complex. Officer Ewing initially testified that "[o]nce we stopped the vehicle, [Mr. Wills] was looking over his shoulder at [the police car]" and only when Officer Ewing exited the vehicle did Mr. Wills begin to flee, running while holding his waistband. But when confronted with the footage from his own body-worn camera, Officer Ewing acknowledged that Mr. Wills "was running when [Officer Ewing] got out of the car."

In any event, Mr. Wills ran and Officers Ewing, Kelly, and Whitehead pursued him on foot, while Officer Woods circled around in the police car. Officer Ewing testified that, because of the way Mr. Wills held his waistband with his right hand as he ran, with his left arm swinging, he believed that Mr. Wills had a firearm on his person. He explained that he based this belief on his prior experiences as an officer in similar situations, where a defendant had run while carrying a firearm in his waistband without a holster. Officer Ewing pursued Mr. Wills through the apartment complex, following him through two covered apartment building walkways. Officer Ewing testified that, as Mr. Wills turned corners during the pursuit, Officer

Ewing would momentarily lose sight of him. In particular, as Mr. Wills exited the second covered walkway and turned to the left, Officer Ewing lost sight of him until Officer Ewing also exited the covered walkway. According to the footage from his body-worn camera, Officer Ewing drew his gun when he lost sight of Mr. Wills, before Officer Ewing exited the second covered walkway. Officer Ewing testified that, as he emerged from the second covered walkway, he heard a "metallic object hit the wall" of the apartment building. He then saw Mr. Wills continuing his flight, no longer clutching his waistband. In addition, Officer Ewing observed Mr. Wills' hand "coming down from . . . a curved shape," as if "coming back from a tossing motion." Officer Ewing did not see any object in Mr. Wills' hand. Because of Mr. Wills' gait, his arm movements, and the metallic noise, Officer Ewing testified that, based on his experience as a police officer, he believed Mr. Wills had thrown a gun against the building after he exited the second covered walkway. At that point, Officer Ewing alerted the other officers to this belief and used the police radio to broadcast the code word for "firearm."

Shortly after exiting the second covered walkway, Officer Ewing caught up to Mr. Wills and forcibly stopped him by pushing him into the patrol car being driven by Officer Woods. Mr. Wills crashed into the car and then fell to the pavement, sustaining abrasions to his head and the palms of his hands. Officer Ewing directed the other officers to search the bushes lining the wall of the apartment building for the firearm. After he assisted Officer Woods to handcuff Mr. Wills, Officer Ewing went over to join the search himself. Less than two minutes later, other MPD officers, including Officer Dmitry Gendelman, arrived on the scene. Officer Gendelman testified that, upon his arrival, he volunteered to assist Officer Woods with standing-up and supervising Mr. Wills, who was now handcuffed with his hands behind his back, while the other officers joined the search for the firearm. After helping Mr. Wills to his feet,

Officer Gendelman immediately unzipped Mr. Wills' backpack, still attached to Mr. Wills' back, and searched its contents. During his testimony, Officer Gendelman explained that he was looking for contraband, including a potential firearm. During this time, Officer Woods questioned Mr. Wills, asking whether he lived on the premises, whether he had any identification, and whether he needed medical attention for his abrasions. As a result of the search of Mr. Wills' backpack, Officer Gendelman found a clear plastic bag containing approximately three ounces of a green leafy substance, later determined to be marijuana, as well as a digital scale.

During and after the search of his backpack, Mr. Wills appeared quite concerned about what Officer Gendelman had discovered in the backpack and made multiple related incriminating statements, such as "You seen what's in my bag. That's why I ran." In addition, while Officer Woods continued to ask Mr. Wills questions to elicit booking information, Officer Gendelman asked him, "You throw something or no?" Mr. Wills responded to Officer Gendelman's question by stating: "Man, look, I only threw a knife, that's what I'm telling you." At the time he made these statements, Mr. Wills had not been given <u>Miranda</u> warnings.

Mr. Wills was subsequently indicted and now faces three criminal charges: (1) unlawful possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1); (2) unlawful possession with intent to distribute marijuana, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D); and (3) use of a firearm during a drug trafficking offense, 18 U.S.C. § 924(c)(1). In the instant motions, Mr. Wills seeks to suppress the contents of his backpack, as well as his statements regarding its contents, as fruit of an illegal search in violation of the Fourth Amendment. He also seeks to suppress his admission to throwing a knife as a violation of <u>Miranda</u> and the Fifth Amendment.

## II.  ANALYSIS

### A.  *Suppression of Backpack Contents*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause."  <u>See</u> U.S. CONST. amend. IV. Because warrantless searches are presumed to be unreasonable, law enforcement officers generally must first obtain a judicial warrant before searching a person or a person's property for evidence of criminal wrongdoing.  <u>See</u> <u>Riley v. California</u>, 134 S. Ct. 2473, 2482 (2014).  In the absence of a judicial warrant, a search will be deemed reasonable only if it falls within a specific exception to the warrant requirement.  <u>See</u> <u>id</u>.; <u>see also</u> <u>United States v. Vinton</u>, 594 F.3d 14, 19 (D.C. Cir. 2010) (Generally, searches "conducted outside the judicial process, without prior approval by judge or magistrate, are <u>per</u> <u>se</u> unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." (quoting <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 372 (1993))).

The government argues that multiple exceptions to the warrant requirement are applicable to the facts presented here.  First, the government argues that the police officers had reasonable suspicion justifying an investigatory stop of Mr. Wills and a search of his backpack under <u>Terry v. Ohio</u>.  <u>See</u> Opp'n at 4-7.  Second, the government asserts that the officers had probable cause to believe that a crime had been committed at the time of the search and, as a result, the search of Mr. Wills' backpack was a permissible search incident to lawful arrest.  <u>See</u> <u>id</u>. at 7-9.  Finally, the government maintains that even if the search of Mr. Wills' backpack was neither a lawful <u>Terry</u> search nor a search incident to a lawful arrest, the firearm inevitably would have been discovered once the officers found the gun in the bushes and thus had probable

cause to arrest Mr. Wills – they then permissibly could have searched him incident to arrest.  See id. at 9-11.  For the following reasons, the Court concludes that none of these exceptions applies here.  As a result, the contents of Mr. Wills' backpack must be suppressed.

1.  Search of Backpack Not a Valid Terry Search

As one exception to the Fourth Amendment's warrant requirement, officers may conduct a brief investigative "Terry stop" when they have a "reasonable, articulable suspicion that criminal activity is afoot."  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)); see also Navarette v. California, 134 S. Ct. 1683, 1687 (2014).  The "reasonable, articulable suspicion" required to justify a Terry stop is only "a 'minimal level of objective justification' – a standard significantly lower than the probable cause required for a warrant."  See United States v. Goddard, 491 F.3d 457, 460 (D.C. Cir. 2007) (quoting INS v. Delgado, 466 U.S. 210, 217 (1984)).  Furthermore, where an officer conducting a Terry stop "has reason to believe, based on 'specific and articulable facts taken together with rational inferences from those facts,' that '[the officer] is dealing with an armed and dangerous individual,'" then the officer may conduct a "protective frisk."  See United States v. Holmes, 385 F.3d 786, 789 (D.C. Cir. 2004) (quoting Terry v. Ohio, 392 U.S. at 21, 27).  Such a frisk is initially limited to an exterior "pat-down."  See Terry v. Ohio, 392 U.S. at 29-30; see also United States v. Holmes, 385 F.3d at 789; United States v. Most, 876 F.2d 191, 195 (D.C. Cir. 1989).  The protective frisk must be "strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'"  See Minnesota v. Dickerson, 508 U.S. at 373 (quoting Terry v. Ohio, 392 U.S. at 26).  Only if an officer, in the course of a permissible frisk, feels an object that is immediately recognizable as contraband may

the scope of the search then be expanded to permit seizure of the contraband.  See Minnesota v. Dickerson, 508 U.S. at 375.

Crediting the officers' testimony, the Court has little doubt that the officers acted reasonably in pursuing and stopping Mr. Wills in light of the circumstances confronting them. At the time Officer Gendelman searched the backpack, Mr. Wills was validly detained in a Terry seizure of his person, justified by reasonable suspicion.[2]  His flight from the police, together with Officer Ewing's observations during the course of his pursuit, supported an objectively reasonable suspicion of criminal activity – namely, that Mr. Wills had unlawfully possessed a firearm and attempted to evade police and throw the firearm away as he fled.  Similarly, these observations gave the officers reasonable suspicion that Mr. Wills might be armed and dangerous, thus justifying a protective Terry frisk for weapons.

The government contends that Officer Gendelman's search of the backpack was a permissible search for weapons under Terry.  It argues that "[a] Terry pat-and-frisk need not be limited to a Defendant's person."  See Opp'n at 5 (citing United States v. Holmes, 385 F.3d at 789).  But the cases cited by the government, including United States v. Holmes, indicate precisely the opposite.  Absent exigent circumstances, a permissible frisk of a bag or backpack must begin with an exterior pat-down of the bag or backpack; only if an officer plainly feels an

---

[2]    At the motions hearing, defense counsel also argued that Officer Ewing's use of force – drawing his gun and pushing Mr. Wills down to crash into the police car and end his flight – escalated the detention from a Terry stop into an unlawful arrest.  Because the Court finds the evidence and statements at issue to have been unlawfully obtained in any event, the Court need not determine whether this use of force converted a legitimate Terry stop into an unlawful arrest or instead merely represented a "legitimate[] escalat[ion]" in response to attempted flight.  See United States v. White, 648 F.2d 29, 40 (D.C. Cir. 1981); see also United States v. Dykes, 406 F.3d 717, 720 (D.C. Cir. 2005); United States v. Wilson, No. 93-3185, 1994 WL 408264 (D.C. Cir. May 5, 1994); United States v. Laing, 889 F.2d 281, 286 (D.C. Cir. 1989).

item that is immediately recognizable as a weapon or other contraband may any further search or seizure be reasonable. See United States v. Leo, 792 F.3d 742, 749 (7th Cir. 2015) ("Leo concedes that, under Terry, the officers lawfully could have patted down the backpack to search for weapons."); United States v. Hernandez-Mendez, 626 F.3d 203, 213 (4th Cir. 2010) (exterior feeling of purse not unreasonable Terry frisk); United States v. Muhammad, 463 F.3d 115, 123-24 (2d Cir. 2006) (exterior pat-down of gym bag not unreasonable Terry frisk); United States v. Adamson, 441 F.3d 513, 521 (7th Cir. 2006) (exterior pat-down of effects in pillowcase bundle not unreasonable Terry frisk); United States v. Holmes, 385 F.3d at 789-91 (removal of scale from defendant's parka pocket lawful only after officer felt a "hard," "square object" in the pocket during reasonable Terry pat-down); cf. United States v. McClinnhan, 660 F.2d 500, 503-04 (D.C. Cir. 1981) (exigent circumstances exception justified warrantless search of briefcase because officers "had no suitable or safe alternative"), abrogated on other grounds by United States v. Thompson, 234 F.3d 725 (D.C. Cir. 2000). But that is not what occurred here. Officer Gendelman did not first pat down the exterior of the backpack to feel for weapons. Rather, he immediately unzipped Mr. Wills' backpack and conducted a full-scale search of its contents. In doing so, Officer Gendelman conducted a warrantless search that clearly "exceeded the bounds of Terry." See United States v. Leo, 792 F.3d at 749-50; cf. United States v. Askew, 529 F.3d 1119, 1127-34 (D.C. Cir. 2008).[3]

---

[3]     The circumstances presented in United States v. Leo are strikingly similar to those presented here. In that case, there was little doubt that, once the defendant was lawfully stopped, officers were permitted to pat down the backpack to search for weapons under Terry. See United States v. Leo, 792 F.3d at 749. But when the officers opened the backpack and emptied its contents, they exceeded the bounds of Terry. See id. at 749-50.

2.  No Probable Cause at Time of Backpack Search

As another exception to the warrant requirement, when a police officer conducts a lawful arrest, the arresting officer may search "the arrestee's person and the area 'within his immediate control' . . . [meaning] the area from within which he might gain possession of a weapon or destructible evidence."  See Chimel v. California, 395 U.S. 752, 763 (1969).  Of course, the requisite predicate to this exception is a valid and lawful arrest supported by probable cause.

"The probable-cause standard is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life.'"  See Maryland v. Pringle, 540 U.S. 366, 370-71 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)).  As a result, "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  See id. (quoting Illinois v. Gates, 462 U.S. at 232); see also United States v. Lassiter, 607 F. Supp. 2d 162, 166 (D.D.C. 2009).  Because it deals with probabilities that depend on the totality of the circumstances, the probable cause standard "is incapable of precise definition or quantification."  See Maryland v. Pringle, 540 U.S. at 371 (citations omitted); see also Illinois v. Gates, 462 U.S. at 235 ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable cause] decision.").  But in essence, probable cause is a reasonable ground for a particularized belief of guilt.  See Maryland v. Pringle, 540 U.S. at 371.  In determining whether an officer had probable cause to arrest an individual, federal courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,

amount to' probable cause." See id. (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

The government argues that, at the time of the search, the officers had probable cause to support a lawful arrest, and as a result, Mr. Wills' backpack was validly searched incident to his arrest. But at the time of the search, the only facts in support of criminal activity were Mr. Wills' flight from police and Officer Ewing's observations that Mr. Wills held his waistband as he ran, that he heard the "clink" of metal on brick when he lost sight of Mr. Wills, and that, after regaining a line of sight, he saw Mr. Wills' hand come down as if completing a tossing motion. These facts undoubtedly established reasonable suspicion that Mr. Wills may have possessed a gun. But more was needed to establish probable cause. Under these circumstances, the officers did not have probable cause to arrest Mr. Wills until they recovered the firearm. See, e.g., United States v. Moore, 75 F. Supp. 3d 444, 449 (D.D.C. 2014) (finding probable cause where officer in pursuit of fleeing defendant both observed and heard gun fall from defendant's waistband); United States v. Tuten, 293 F. Supp. 2d 30, 32 (D.D.C. 2003) ("The seizure of the defendant here did not occur until Officer Davis tackled the defendant, at which time the officers had reasonable suspicion for an investigatory stop and even probable cause for arrest after viewing the gun in plain view." (citation omitted)); see also United States v. Wilson, 2 F.3d 226, 232 (7th Cir. 1993) ("The baggies [containing marijuana, which Mr. Wilson had thrown as he fled from police,] supplied the probable cause that indisputably converted the [post-flight Terry stop] into a full arrest. At this point, it is without question that the officer had probable cause to arrest Mr. Wilson."); cf. United States v. Wood, 981 F.2d 536, 543 (D.C. Cir. 1992) (Henderson, J., concurring) ("Probable cause did not exist until the gun fell from Wood's midsection."). Furthermore, while the Court must make the probable cause determination from

the standpoint of an objectively reasonable officer, it is worth noting that even after he had searched the backpack, Officer Gendelman expressly emphasized to Mr. Wills that he was not under arrest – when Mr. Wills asked whether Officers Gendelman and Woods were "trying to lock [him] up," Officer Gendelman repeatedly responded, "we not even there yet."

Because probable cause did not exist to lawfully arrest Mr. Wills at the time of the search, his backpack was not lawfully searched incident to arrest.

### 3. Discovery of Backpack Contents Not Inevitable

Where evidence is discovered as the result of an unlawful search, it may nonetheless be admissible if its discovery was inevitable.[4]  To prevail on an inevitable discovery theory, the government must prove by a preponderance of the evidence that "even without the unlawful seizure, the evidence it seeks to admit would have been discovered anyway."  See United States v. Holmes, 505 F.3d 1288, 1293 (D.C. Cir. 2007) (citing Nix v. Williams, 467 U.S. 431, 444 n.5 (1984)).  In determining whether the government has met this burden, a Court must assess the "demonstrated historical facts capable of ready verification or impeachment."  See id. (quoting Nix v. Williams, 467 U.S. at 444 n.5).  "[I]nevitable discovery involves no speculative elements."  See id. (quoting Nix v. Williams, 467 U.S. at 444 n.5).[5]

---

[4]        The D.C. Circuit has expressed significant doubt as to whether the inevitable discovery doctrine may ever be applied to "primary evidence," as opposed to mere "derivative evidence."  See United States v. $639,558.00 in U.S. Currency, 955 F.2d 712, 718-21 (D.C. Cir. 1992).  But see id. at 721-22 (Silberman, J., concurring in part).  And there is no question that, here, the contents of Mr. Wills' backpack amount to primary evidence.  See id. at 719.  But the Court need not decide whether the inevitable discovery doctrine is inapplicable per se to primary evidence obtained from an illegal search or seizure, because the government has failed to meet its burden to show that the contents of Mr. Wills' backpack would have been inevitably discovered in any event.  See id. at 718, 721.

[5]        The Court notes that the federal circuit courts are divided as to whether the inevitable discovery doctrine requires a showing that police were actively pursuing an alternative

In the circumstances presented here, there are two avenues by which the government might assert inevitable discovery: an inventory search or a search incident to arrest. In this case, however, the government has not presented any affirmative evidence of an inventory search policy of the MPD which would have inevitably resulted in the discovery of the contents of Mr. Wills' backpack. In fact, at the motions hearing, the government expressly disclaimed any reliance on an inventory search theory for purposes of inevitable discovery analysis. Instead, the government relies exclusively on the argument that the contents of the backpack would have been discovered pursuant to a lawful search incident to arrest.

The government correctly notes that although the officers did not have probable cause at the time of the search, probable cause materialized shortly thereafter when officers found the gun. The government thus argues that discovery of the backpack's contents was inevitable because, once the officers found the gun and thus had probable cause to arrest Mr. Wills for a firearms offense, the officers could have lawfully searched the backpack incident to arrest. In support of this contention, the government cites an MPD General Order, which apparently serves as the Department's search incident to arrest policy. The Order provides in relevant part that "[a]t the time of arrest, prisoners shall be thoroughly searched and all personal property, including those items (e.g., ties, belts, suspenders, scarfs, etc.) that could be used to inflict injuries upon themselves, shall be removed." See METRO. POLICE DEP'T, GEN. ORDER 601.1 ¶ I.A.8 (Apr. 30, 1992); see also Opp'n at 11.

Of course, this generic and expansive provision must still comply with the requirements of the Fourth Amendment. And under the Fourth Amendment, the warrant

---

method of investigation at the time the constitutional violation occurred, and the D.C. Circuit has yet to weigh in on this debate. See 45 GEO. L.J. ANN. REV. CRIM. PRO. 267 n.675 (2016).

requirement remains the general rule for a lawful search: "Even if an officer has probable cause to believe that a bag (or a box, or a house) contains evidence of criminal activity, he must get a warrant before searching it unless one of the actual exceptions to the warrant requirement applies." See United States v. Howard, 156 F. Supp. 3d 1045, 1048 (N.D. Cal. 2016) (first citing Riley v. California, 134 S. Ct. at 2486; then citing United States v. Chadwick, 433 U.S. 1, 11-13 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991)). A search incident to lawful arrest is one such exception.

When conducting a lawful arrest, an officer may search "the arrestee's person and the area 'within his immediate control' – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." See Chimel v. California, 395 U.S. at 763; see also United States v. Wright, 233 F. Supp. 3d 165, 174 (D.D.C. 2017). Limiting the scope of a search incident to arrest to the area from which a suspect might gain possession of a weapon or destructible evidence "continues to define the boundaries of the exception, [and] ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." See Arizona v. Gant, 556 U.S. 332, 339 (2009) (citing Chimel v. California, 395 U.S. at 763). Accordingly, "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." See id. (citing Preston v. United States, 376 U.S. 364, 367-68 (1964)).

In light of this standard, whether or not a closed backpack or bag can be searched incident to arrest depends on a fact-intensive assessment of the totality of the circumstances. See, e.g., United States v. Myers, 308 F.3d 251, 266 (3d Cir. 2002). And although the D.C.

Circuit has applied this fact-intensive standard, it has not done so in circumstances similar to those presented here. Compare United States v. Lyons, 706 F.2d 321, 325, 330-31 (D.C. Cir. 1983) (holding police discovery of loaded revolver in overcoat hanging in closet while defendant was "sitting, handcuffed . . . several yards away" and surrounded by six police officers was not valid search incident to arrest), with United States v. Abdul-Saboor, 85 F.3d 664, 670 (D.C. Cir. 1996) (holding police discovery of loaded weapons in apartment after suspect requested access to the searched area and attempted to hide a weapon to be valid search incident to arrest). Thus, the Court looks to the various factors which other federal courts have considered in assessing the totality of the circumstances to determine whether police properly searched a backpack or similar personal bag incident to arrest. These factors include: whether the defendant was handcuffed or otherwise restrained, see, e.g., United States v. Cook, 808 F.3d 1195, 1199 (9th Cir. 2015); United States v. Myers, 308 F.3d at 267; United States v. Matthews, No. 09-612, 2010 WL 2671388, at *1, *5 n.3 (E.D. Pa. July 1, 2010); the location of the backpack in relation to the defendant, see, e.g., United States v. Cook, 808 F.3d at 1200; United States v. Perdoma, 621 F.3d 745, 750-51 (8th Cir. 2010); United States v. Bennett, No. 08-535, 2010 WL 1427593, at *1, *6 (E.D. Pa. Apr. 8, 2010); United States v. Manzo-Small, No. 05-0480, 2006 WL 1113584, at *1, *3 (D. Or. Apr. 21, 2006); whether the defendant was difficult to restrain or had resisted arrest, see, e.g., United States v. Perdoma, 621 F.3d at 750-51; whether the arresting officer had reason to suspect the defendant was armed, see, e.g., United States v. Cook, 808 F.3d at 1200; whether there were other officers nearby to surround or assist in supervising the defendant, see, e.g., United States v. Myers, 308 F.3d at 267; United States v. Bennett, 2010 WL 1427593, at *6; and the thoroughness and length of the search, see, e.g., United States v. Cook, 808 F.3d at 1199.

Here, Mr. Wills had been handcuffed with his cuffed wrists and arms behind his back when Officer Gendelman unzipped the backpack. As defense counsel has argued, it appears from the officers' body-worn camera footage that Mr. Wills would have had to engage in significant acrobatics in order to gain access to the contents of his backpack at the time it was searched. See United States v. Lyons, 706 F.2d at 330. And in fact, Officer Gendelman testified unequivocally that Mr. Wills could not have accessed the contents of his backpack while he was handcuffed. Thus, even if probable cause had existed at the time of the search, there does not appear to have been any realistic possibility that Mr. Wills could have accessed the contents of his backpack at that time. And where the "justifications for the search-incident-to-arrest exception are absent," the exception does not apply. See Arizona v. Gant, 556 U.S. at 339.

More to the point, if the officers had waited until they had probable cause to arrest Mr. Wills, it remains unclear whether they then would have had cause to properly and lawfully search his backpack incident to arrest. It is impossible for the Court to do more than hypothesize as to what "inevitably" would have occurred in such a scenario. Had the backpack not been illegally searched prior to the existence of probable cause, would officers have searched the backpack while it was still on Mr. Wills' back, or removed it and brought it several feet away? Would officers have removed Mr. Wills' handcuffs to take off the backpack or simply unbuckled the straps while Mr. Wills remained handcuffed? Would Mr. Wills have been locked inside of a police vehicle before or during such a search? Would his backpack have been removed before he was placed in a police vehicle? How many officers would have stood by to supervise Mr. Wills while another officer searched the backpack, either nearby or elsewhere? Such hypothesizing and speculation is the very antithesis of the inevitable discovery doctrine. See United States v. Holmes, 505 F.3d at 1293.

Certainly, what officers did later is somewhat instructive. Officer Keleman's body-worn camera footage shows that a few minutes later, while officers were tending to Mr. Wills' bleeding hands and after the gun had been found, Officer Gendelman conducted a second search of the backpack. He reopened the backpack, removed the bag of marijuana, and then spoke to Mr. Wills while confronting him with the bag of marijuana.[6] Mr. Wills' backpack then hung open for several more minutes. After cleaning and bandaging Mr. Wills' hands, Officer Keleman then removed Mr. Wills' backpack by undoing the straps, while Mr. Wills remained handcuffed. Officer Keleman walked a few feet away with the backpack and there proceeded to search it for a third time. Subsequently, Officer Keleman and then another unidentified officer proceeded to hold the backpack, carrying it as they walked around the scene before eventually leaving with the bag in a car separate from Mr. Wills' transport. Based on these facts, if either of these searches had been conducted as an initial search incident to arrest, it is not readily apparent that Mr. Wills would have had access to or control of the backpack justifying the exception to the search warrant requirement.

But again, the Court need not decide whether either or both of these searches of Mr. Wills' backpack would have amounted to a lawful search incident to arrest had they not been preceded by an unlawful search. It is certainly possible to review the various courses of conduct available to the officers and speculate about what they <u>could</u> have done to eventually lawfully discover the marijuana as the result of a reasonable search. <u>Cf</u>. <u>Gore v. United States</u>, 145 A.3d

---

[6] The Court notes that it does not have the full benefit of knowing precisely what Officer Gendelman did and said at this point. It appears that Officer Gendelman turned off the recording function of his body-worn camera when he began to speak with two witnesses. It does not appear that he ever reactivated his body-worn camera, despite being present at the scene and engaging with Mr. Wills, witnesses, and evidence for at least fifteen minutes after turning off his body-worn camera.

540, 549 (D.C. 2016) ("'Would' – not 'could' or 'might' – is the word the Supreme Court used in <u>Nix v. Williams</u> and is, therefore, the 'constitutional standard.'" (citation omitted)).  But "all of this is nothing more than possibility."  <u>See</u> <u>United States v. Holmes</u>, 505 F.3d at 1294.  Because an unlawful search first occurred, the government has the burden to show by a preponderance that the evidence would have been found inevitably.  The circumstances here do not present the kind of readily apparent facts that show, for example, that large volunteer search teams scanning a defined grid area, given only a few more hours' time, inevitably would have found a body.  <u>See</u> <u>Nix v. Williams</u>, 467 U.S. at 449-50.  The government simply cannot show what the officers necessarily <u>would</u> have done absent the initial illegal search, and thus the lawful discovery of the contents of Mr. Wills' backpack was not inevitable.  <u>See</u> <u>Nix v. Williams</u>, 467 U.S. at 444 n.5; <u>Gore v. United States</u>, 145 A.3d at 548-49.  As a result, the contents of the backpack must be suppressed as fruit of the poisonous tree.

## *B.  Suppression of Statements Regarding Contents of Backpack*

As noted above, evidence derived from an illegal search or seizure must be suppressed unless the government can show intervening circumstances sufficient to break the causal connection between the Fourth Amendment violation and the resulting evidence.  <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 602-03 (1975).  This exclusionary rule extends to any fruits of a Fourth Amendment violation – "whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention."  <u>See</u> <u>United States v. Crews</u>, 445 U.S. 463, 470 (1980); <u>see</u> <u>also</u> <u>United States v. Jones</u>, 374 F. Supp. 2d 143, 153 (D.D.C. 2005); <u>United States v. Wiggins</u>, 211 F. Supp. 2d 81, 87-90 (D.D.C. 2002); <u>United States v. Henry</u>, 797 F. Supp. 1, 5 (D.D.C. 1992).

At the motions hearing, the government suggested that the Fourth Amendment's fruit of the poisonous tree doctrine does not apply to statements. But this is clearly not the case. See Brown v. Illinois, 422 U.S. at 602 (The Constitution "requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963))); see also United States v. Cotton, 722 F.3d 271, 278 (5th Cir. 2013) (citing Brown v. Illinois, 422 U.S. at 602). And although the Supreme Court has never squarely confronted whether a statement may be excluded as the fruit of an illegal search, rather than the fruit of an illegal seizure, the logical application of existing case law requires such a conclusion. See WAYNE R. LAFAVE, 6 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.4(c) (5th ed. 2017); see also Oregon v. Elstad, 470 U.S. 298, 306 (1985) ("The Wong Sun doctrine applies as well when the fruit of the Fourth Amendment violation is a confession."); Fahy v. Connecticut, 375 U.S. 85, 91 (1963) ("[P]etitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence."). This is because "[v]erbal evidence obtained from unlawful police action 'is no less the fruit of official illegality than the more common tangible fruits of the unwarranted intrusion.'" See Gatlin v. United States, 326 F.2d 666, 672 (D.C. Cir. 1963) (quoting Wong Sun v. United States, 371 U.S. at 485); see also New York v. Harris, 495 U.S. 14, 20 (1990); Dunaway v. New York, 442 U.S. 200, 216-18 (1979).

Accordingly, the Court must decide here "whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." See United States v. Crews, 445 U.S. at 471; see also Dunaway v. New York, 442

U.S. at 216-19.  In making this determination, the Court looks to the relevant circumstances, including the temporal proximity of the violation and the confession, the presence of intervening circumstances, and the purpose and flagrancy of any official misconduct, as well as whether and when any Miranda warnings were given.  See Brown v. Illinois, 422 U.S. at 603-04.

Here, mere seconds passed between the start of Officer Gendelman's illegal search and Mr. Wills' statements acknowledging the contents of his backpack.  In fact, the illegal search was still ongoing when Mr. Wills first made the statement, "You seen what's in my bag.  That's why I ran."  And Officer Gendelman's body-worn camera footage indicates that Mr. Wills was fully cognizant of the search of his backpack – he turned his neck toward Officer Gendelman in an apparent attempt to see what was going on, while the unzipping of his backpack and rustling of the plastic bag were clearly audible.  Confirming this to be the case, Mr. Wills acknowledged the search and asked Officer Gendelman whether he had seen what was inside of his backpack, rhetorically answering "that's why I ran."  The illegal search and resulting statements occurred in short succession, no Miranda warnings had been given, and the government has not directed the Court to any other potentially attenuating factors.  Accordingly, Mr. Wills' statements pertaining to the contents of his backpack must be suppressed as fruit of the poisonous tree.

### C.  Suppression of Statement Regarding Throwing a Knife

In Miranda v. Arizona, the Supreme Court announced certain prophylactic measures to guard against compelled self-incrimination by requiring that custodial interrogation be preceded by a warning that adequately advises the defendant of the right to remain silent and the right to the presence of an attorney during questioning.  See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966); see also United States v. Cooper, 85 F. Supp. 2d 1, 22 (D.D.C. 2000).  As

the Court later explained, <u>Miranda</u> "laid down 'concrete constitutional guidelines for law enforcement agencies and courts to follow.'" <u>See</u> <u>Minnesota v. Dickerson</u>, 508 U.S. at 435 (quoting <u>Miranda v. Arizona</u>, 384 U.S. at 442). In short, <u>Miranda</u> set forth "a constitutional rule." <u>See</u> <u>id</u>. at 439. If police fail to provide the <u>Miranda</u> warnings prior to custodial interrogation, absent circumstances warranting an exception to this rule, "any statements which are the product of police initiated interrogation may not be used against the accused in the prosecution's case-in-chief." <u>See</u> <u>United States v. Cooper</u>, 85 F. Supp. 2d at 22.

   Mr. Wills has moved to suppress his statements made in response to custodial interrogation absent the requisite <u>Miranda</u> warnings. The government notes that Mr. Wills "has not identified any particular statement he seeks to suppress." <u>See</u> Opp'n at 11. But the government has represented that, at trial, it would seek to introduce an admission by Mr. Wills that he threw a knife. Specifically, the government proffers the exchange between Mr. Wills and Officer Gendelman which occurred shortly after Officer Gendelman arrived at the scene and searched Mr. Wills' backpack. According to the body-worn camera footage introduced as Defense Exhibit 3, at approximately 4:58:16 P.M., Officer Gendelman asked, "You throw something or no?" and Mr. Wills responded, "Man, look, I only threw a knife, that's what I'm telling you." This questioning occurred after Mr. Wills had fled from officers on foot and Officer Ewing had pushed him into the police car and onto the ground to end his flight. At the time of this questioning, Mr. Wills' hands were behind his back, handcuffed and bleeding after his fall. He was standing up, after Officer Woods and Officer Gendelman had helped pull him to his feet, and he appeared relatively cooperative – he stood still and allowed the officers to search his person, for example, and he responded to their questions. The backpack hung down his back, with the straps looped around both shoulders. Only seconds prior, he had been subjected to an

illegal search of his backpack.  See supra Part II(A).  And he had not been given any Miranda

warnings.[7]

The government has conceded that "Officer Gendelman's question undoubtedly

constituted interrogation."  See Opp'n at 16.  And the government does not appear to contest that

Mr. Wills was in custody, for purposes of Miranda, at the time of the questioning.  See id. at

11-19; see also United States v. Clemmons, 201 F. Supp. 2d 142, 144-45 (D.D.C. 2002) (holding

that a suspect can be in police custody for purposes of Miranda before formal arrest if, for

example, a Terry stop deprives a suspect of "freedom of action in a significant way").  Instead,

the government argues that Officer Gendelman's question was justified by the public safety

exception to Miranda's requirements.

In situations that pose a threat to public safety, the need for answers to questions

reasonably prompted by safety concerns "outweighs the need for the prophylactic rule protecting

the Fifth Amendment's privilege against self-incrimination."  See New York v. Quarles, 467

U.S. 649, 657 (1984).  Thus, Miranda does not apply where police officers ask questions

reasonably prompted by an objective concern for the safety of the public or their own safety.  See

id. at 655-59.  In determining whether a question falls within this public safety exception, courts

consider the totality of the circumstances.  See United States v. Jones, 567 F.3d 712, 715 (D.C.

Cir. 2009).  The public safety exception applies "only where there are sufficient indicia

supporting an objectively reasonable need to protect the police or the public from immediate

harm."  See id. at 717 (quoting United States v. Estrada, 430 F.3d 606, 614 (2d Cir. 2005)).

---

[7]        The Court notes that the government has failed to provide any evidence of when,
if ever, Mr. Wills was eventually Mirandized by the police.  Despite body-worn camera footage
that spans more than twenty minutes from the start of the encounter, it does not appear that any
of the officers who interacted with Mr. Wills at the scene ever gave him Miranda warnings.

Viewing the totality of the circumstances here, the government has failed to show that Officer Gendelman's question was motivated by an objectively reasonable public safety concern.[8] At the time Officer Gendelman asked Mr. Wills whether he had thrown something, there was no ongoing emergency or threat to safety. Mr. Wills was compliant, handcuffed, and surrounded by multiple armed police officers; numerous other officers were on the scene searching for a firearm; and the search area was relatively defined and secured. In addition, Officer Gendelman had already (unlawfully) searched the contents of Mr. Wills' backpack. These circumstances stand in stark contrast to the cases cited by the government, in which officers were justified under the public safety exception in asking whether suspects currently had any weapons on their persons. See Opp'n at 17 n.7; see also United States v. Jones, 567 F.3d at 713. Under the circumstances presented here, Officer Gendelman's question was objectively made not to resolve a threat to public safety, but to elicit an incriminating statement from Mr. Wills and more expeditiously recover incriminating evidence.

The government urges the Court nonetheless to find that public safety was implicated by an objective concern for an unrecovered and potentially loaded firearm. The government characterizes the officers' search as a "frantic" one and suggests that, as a result,

---

[8] At the same time, the totality of the circumstances do not indicate the kind of extreme coercion which might render Mr. Wills' statement an involuntary confession elicited in violation of the Fifth Amendment Due Process Clause. See, e.g., Colorado v. Connelly, 479 U.S. 157, 165-67 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); United States v. Murdock, 667 F.3d 1302, 1307 (D.C. Cir. 2012). To the contrary, although there was an extensive and unwarranted delay in providing Mr. Wills with Miranda warnings, most of the officers' questions were aimed at establishing his residence, identity, and medical status, and thus did not amount to interrogation. And although Officer Ewing used significant force to stop Mr. Wills' flight, the officers' subsequent interactions with him do not appear to have been coercive in nature. Accordingly, without more, the government has met its burden to show voluntariness for purposes of the Due Process Clause. See United States v. Murdock, 667 F.3d at 1307.

Officer Gendelman's question – "You throw something or no?" – reflected an objective need to urgently locate the gun.  See Opp'n at 17.  But again, the circumstances here stand in stark contrast to those presented in cases where the public safety exception has been found to apply.  This was not an instance, for example, in which one or two officers faced the imperative of locating a gun which they believed had been discarded in an unsecured zone from which some member of the public might retrieve it and either destroy the evidence or harm themselves or others.  See New York v. Quarles, 467 U.S. at 652, 657 ("The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket," where "an accomplice might make use of it, [or] a customer or employee might later come upon it.").  Rather, a large number of officers were searching a relatively secured and limited area in a diligent and methodical manner, while Officers Woods and Gendelman stayed with the detained suspect.  In fact, as officers searched the bushes alongside the apartment building, they appeared determined to locate a firearm, as evidenced by the body-worn camera footage and the testimony of Officers Ewing and Gendelman.  Furthermore, by its plain language, the question itself did not seek to have Mr. Wills assist in locating a firearm – Officer Gendelman did not ask, for example, "where is the gun?" or "did it land in the bushes?"  Rather, Officer Gendelman asked a question designed to elicit an incriminating response:  "You throw something or no?"  Assessing the plain meaning of Officer Gendelman's question in light of the objective circumstances, the government has

failed to justify application of the public safety exception to <u>Miranda</u>'s requirements.[9]

Accordingly, Mr. Wills' statement that he threw a knife must be suppressed.

## III.  CONCLUSION

For the foregoing reasons, the Court will suppress the contents of Mr. Wills' backpack, as well as his statements relating to the contents of his backpack, as fruit of the poisonous tree under the Fourth Amendment.  The Court will also suppress Mr. Wills' statement to Officer Gendelman that he threw a knife as a result of the failure to first provide Mr. Wills with the requisite <u>Miranda</u> warnings.  Accordingly, it is hereby

ORDERED that Mr. Wills' motion [Dkt. No. 12] to suppress statements is GRANTED; and it is

FURTHER ORDERED that Mr. Wills' motion [Dkt. No. 13] to suppress tangible evidence is GRANTED.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  August 8, 2018

---

[9]    The government argues, and the Court agrees, that the objective circumstances should not be reviewed with the bias of hindsight, in light of the fact that, "as Officer Gendelman asked his question, officers instantaneously found the gun."  <u>See</u> Opp'n at 17.  Thus, the Court has based its analysis on the objective factual circumstances as they would have appeared to a reasonable officer at the time Officer Gendelman asked the question at issue.